THOMAS FAWCETT & SONS *v.* STEAM TOW-BOAT L. W. MORGAN.

*(District Court, W. D. Pennsylvania.   February 7, 1881.)*

1. COLLISION — TOW-BOAT CHANNEL — BARGES AT ANCHOR — TOW IN MOTION.

> Where barges were so moored as to encroach upon the tow-boat channel of the Ohio river, and be in the way of descending coal-tows, such tows being unwieldy and without sufficient steam-power to resist the force of the current, *held,* that the rule which requires a steamer in motion to steer clear of a vessel at anchor was not applicable to a descending tow-boat, whose tow struck the exposed barges, and that the tow-boat was not liable for damages, there being no want of proper effort on its part to avoid the collision.

2. SAME—BARGES ANCHORED IN CHANNEL—MODE OF NAVIGATING TOW.

> Where there are two commonly-practiced and approved modes of navigating tow-boats with coal-tows past a certain point, parties who have there placed their barges so as to encroach upon the tow-boat channel, and be in the way of descending coal-tows, have no right to complain that a descending tow-boat did not pursue that one of the two modes which was the safer for the barges in their exposed situation, when those navigating the tow-boat did not know or have reason to suspect the barges were there until it was too late to change the mode of running the point.

3. SAME — VERDICT IN COMMON-LAW ACTION — CONTRIBUTORY NEGLIGENCE—EVIDENCE.

> The owners of the tow-boat brought a common-law action against the owners of the barges for damages sustained by the collision, alleging that it was caused by the defendants having negligently and unlawfully obstructed the channel, and there was a general verdict and a judgment thereon for the defendants.  *Held,* that in a suit in admiralty by the owners of the barges against the tow-boat, the judgment in the action at law was not conclusive against the tow-boat, even to the extent of fixing upon the latter contributory negligence, it not appearing upon what ground the jury based their verdict, and one of the defences submitted to them being that the barges were in circumstances of distress from a previous disaster, and the emergency such that the owners were excusable in putting them where they did.

In Admiralty.

ACHESON, D. J.   Late on the afternoon of November 25, 1874, the libellants' steam tow-boat Boaz, having in tow nine barges loaded with coal, left Pittsburgh bound for Louisville. The stage of water in the Ohio river was about eight and one-half feet—an ordinary coal-barge rise.   Shortly after 6 o'clock

that evening the Boaz grounded her tow three miles below Pittsburgh, on a bar which lies opposite the foot of Brunot's island, and is distant therefrom about 350 feet. It was then dark, and the pilot of the Boaz had erroneously calculated her position in the stream in respect to the bar. Soon after the tow grounded, the steam-boat Mary Davidge, in descending the river, struck the grounded tow, crippling one of the barges and driving the Boaz and her tow further upon the bar. At the then stage of water the tow-boat channel hugs the foot of Brunot's island and runs near the south-western shore of the river at McKees's r cks, situate a few hundred feet below the island, the channel there making a short turn to the right below the bar. A strong current at that stage of water prevails at the foot of the island.

Within an hour after the grounding of the Boaz, two ascending steam-boats came to her relief and took from the bar four of the barges, which, by the direction of the captain of the Boaz, they placed at shore about 250 feet below the "knuckle" of McKee's rocks. The Boaz herself took the crippled barge and one other barge to the same shore. Three of the stranded barges remained fast on the bar. At first the six barges at shore lay two abreast, but during the night, and before the disaster hereafter to be mentioned, they were placed three abreast. They were each 24 feet in width, and the inside barge lay some distance out from the shore, but how far is not accurately shown. Some of the witnesses say 20 feet, others 60 feet. It is, however, in my judgment, clearly proved that these barges lay in the way of tow-boats going out on that rise, and in a position of peril both for the barges themselves and descending tows by reason of the extreme danger of the latter coming in collision with the barges.

There was a safe landing at Neville station, one mile below, to which the five uninjured barges might have been taken in about one hour's time, and a proper landing for the crippled barge on the side of the river opposite McKee's rocks. The assisting steam-boats would have taken the five barges to Neville station if requested. The captain and pilot of the Boaz, however, did not at first know the extent of the

injury to the crippled barge, and they expected to be able shortly to resume their voyage.

Soon after 4 o'clock next morning, and before daylight, the steam tow-boat L. W. Morgan left Pittsburgh, with a tow of eight barges loaded with coal, bound for Cincinnati. The tow was of the usual size for a boat like the Morgan, and was made up in the customary manner, to-wit: Six barges were in front of the tow-boat, lashed together in two tiers of three barges each, and on either side of the tow-boat was a barge extending back on the boat some 40 feet. The entire length of the tow from the front end of the forward barges to the stern of the steamboat was about 360 feet, and the extreme width was 72 feet. The barges were drawing about six feet of water, the ordinary draft. When the Morgan reached the head of Brunot's island the pilot at the wheel and the other pilot, who also was in the pilot-house, discovered the lights upon the Boaz and her barges. Both these pilots then supposed the lights to be those of an ascending boat; and this was a reasonable conjecture, for the bow of the Boaz was up stream, and she was then either in the act of moving from the lower end of the shore barges to a place below the bar, where the stranded barges lay, or she had just taken the latter position. No one on the descending tow had heard of the misfortune which befell the Boaz the evening before, and the pilots of the Morgan were entirely ignorant of the then condition of affairs at the foot of the island. When the lights were first seen the Morgan was about a mile up stream; but she had approached within about 400 yards of the foot of the island before her pilots discovered, or were able to discover, that there were barges aground on the bar at the right of the channel, and barges a short distance below to the left at shore. The Morgan's engines had already been reversed to check her headway, and she continued so to work them, putting on full steam-power. When she reached the foot of the island she backed her stern strong into the island and threw the head of her tow out to avoid the barges. But the best efforts of the Morgan failed, and the larboard side of her tow struck the outside of the libellants' upper outside barge near

its upper end.   That barge was so damaged that it soon sunk.   Another of the libellants' barges was very slightly injured.   Their entire loss was $2,044.56.   By the collision the owners of the Morgan were also sufferers to the extent of $1,600.   Three of their barges were injured, of which two eventually sunk.   The collision occurred shortly after 5 o'clock A. M.

The libellants allege that their loss was occasioned by the "negligent, careless, and unskilful manner in which the said steam-boat L. W. Morgan was navigated and handled;" and they seek a decree against the vessel.   The libel does not specify wherein the alleged negligence, carelessness, and unskilfulness consisted; but the libellants insist that the proofs show that it was the duty of the Morgan to have so descended the river in the vicinity of Brunot's island, the bar, and McKee's rocks, as to pass out from McKee's rocks around the bar by "flanking," and not in the manner in which the boat was there run; and that by thus "flanking out" the collision with the libellants' barges would have been avoided.   In no other particular has complaint been urged against the Morgan.

The expert witnesses speak of two well-known methods of navigating the river at and out from McKee's rocks by tow-boats with tows in charge, viz., by "flanking" and by "steer-ing."   Perhaps the witness Michaels most clearly explains these methods.   He describes "steering out" thus: "When we get to the point [*i. e.*, lower end] of the island you back the stern of the steam-boat up to the land, throw her head away from the head of the shore, swing her out, and drive ahead."   The other method he thus describes: "In flanking we com-mence away above; flank down the island, with the stern of your steam-boat towards the island, till you come down near enough—till you get through to the inside of the bar—and turn the stern of your steam-boat towards the bar and flank out."   The tow-boat ordinarily draws less water than her tow, and this witness states that in flanking as above described the stern of the tow-boat overlays the bar.   The evidence clearly establishes that tow-boats with such tows as that of the Mor-gan pass out from McKee's rocks in both the ways above

described,—sometimes by "flanking," sometimes by "steering,"—and as often by the latter as the former method. There is no fixed rule as to running this place, and on each occasion the pilot exercises his best judgment as to the course he will adopt.

Some of the expert witnesses (but not all) say that flanking out from McKee's rocks is the safest course generally. Most of them, if not all, testify that it was the best and safest course for the libellants' barges, in view of their locality at shore, and the libellants insist that the Morgan is chargeable with negligence in not pursuing that course. But I cannot adopt this conclusion. To pronounce "steering out" from McKee's rocks to be negligence *per se* would be to condemn the common practice of some of the best of pilots on the river. Was, then, the Morgan censurable in undertaking that mode of navigation on the occasion in question? I think not. When she entered at the head of Brunot's island her pilots did not know, and had no reason to suspect, the state of things existing below. They were not bound to anticipate that they would find the libellants' barges projecting into the ordinary tow-boat channel, at that stage of water, at McKee's rocks; and when they discovered these barges it was too late to attempt to change the Morgan's stern from the island to the bar. Such a maneuver then—with a huge and unwieldy tow, in a five-mile current, before daylight, with stranded barges on the bar, whose precise location was not known—would have been extremely hazardous, if not inevitably fatal to both parties. To effect a landing at that time and place was impracticable, and the Morgan had not power to back up stream, or even to hold her tow against the current. She could not do otherwise than pursue her descending course. The most that could be done was to check the boat's headway by reversing the engines, and this was done. I am satisfied that, after the danger was perceived, all that was possible to avert the catastrophe was promptly done; and I am of opinion that, from first to last, the Morgan was blameless.

It however appears that the owners of the Morgan brought

suit against the present libellants in the court of common pleas No. 1, of Allegheny county, to recover damages sustained by them in consequence, as they alleged, of the libellants having negligently and unlawfully obstructed the tow-boat channel, in which suit there was a verdict for the defendants and a judgment in their favor, which was affirmed by the supreme court of Pennsylvania. And it is claimed that this judgment is conclusive against the owners of the Morgan to the extent of fixing upon them at least contributory negligence. But the verdict in that suit was a general one, and it does not appear upon what ground the jury based their finding. It was contended, on behalf of the defendants there, (the libellants here,) that they were justified in temporarily mooring their barges off McKee's rocks in their then circumstances of distress. That defence was submitted to the jury, as will appear from the following extract from the charge of the learned judge who tried the case: "But if you should think" (he instructed the jury) "that the weight of the evidence does not make out that the defendants, under all the circumstances, were negligent; that, intending to continue their voyage, they did what ordinarily prudent and skilful pilots would do under the circumstances,—you should find for the defendants." It is highly probable that the jury—taking a charitable view of the conduct of the defendants—found a verdict in their favor based upon the conclusion that in the emergency a reasonable necessity existed for placing their barges where they did. But, assuredly, there was no absolute necessity for so doing; and when the libellants chose to put their barges in a place of manifest danger,—in the way of unmanageable tows which they knew were coming out on that rise with pilots ignorant of the facts,—the libellants must be held to have taken the consequent risks of collisions. Obviously the case is not one for the application of the rule which requires a steamer to steer clear of a vessel at anchor. *The Petrel,* 18 Law Rep. (8 N. S.) 185. It may be added that it was most unfortunate that the barges were not suffered to remain as at first placed along the shore, two abreast;

for then, it is safe to say, the tow of the Morgan would have passed them without hurt.

Upon the whole case, I am of opinion that the libel should be dismissed, with costs. And now, February 7, 1881, upon consideration, it is ordered, adjudged, and decreed that the libel in this case be dismissed, and that the libellants pay the costs.